MONTANA POWER COMPANY, a corporation, et al., Plaintiffs-Appellees,

v.

ENVIRONMENTAL PROTECTION AGENCY et al., Defendants-Appellants,

and

Northern Cheyenne Tribe and Northern Plains Resource Council, Intervenors.

MONTANA POWER COMPANY, a corporation, et al., Plaintiffs-Appellees,

v.

ENVIRONMENTAL PROTECTION AGENCY et al., Defendants,

and

Northern Plains Resource Council and Northern Cheyenne Tribe, Intervenors-Appellants.

The MONTANA POWER COMPANY, Washington Water Power Company, Puget Sound Power and Light Company,

Portland General Electric Company and
Pacific Power and Light Company, Peti-
tioners-Appellants,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent-Appellee.

Nos. 77–2521, 77–2253 and 78–1140.

United States Court of Appeals,
Ninth Circuit.

July 16, 1979.

John L. Peterson, Butte, Mont., for Montana Power Co.

Bruce J. Terris, Washington, D. C. (argued), Larry G. Gutterridge, Dept. of Justice, Washington, D. C., for E. P. A.

On Petition to Review a Decision of the Environmental Protection Agency.

Before MERRILL and WRIGHT, Circuit Judges, and SWEIGERT, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

These consolidated cases are classic examples of the difficulties inherent in interpreting the Clean Air Act, as amended, 42 U.S.C.A. §§ 7401, et seq. (West Supp.1978).[1] At issue is whether Montana Power and others[2] "commenced construction", under the Clean Air Act and Environmental Protection Agency (EPA) regulations, of two 750 megawatt coal-fired electric generating plants at Colstrip, Montana (Colstrip Units 3 & 4) before a grandfathering cutoff date. If so, the units are exempt from preconstruction review and permitting procedures for the "prevention of significant deterioration" of air qualify (PSD review and permitting).

Numbers 77–2253 and 77–2521 are appeals by the EPA and intervenors Northern Plains Resource Council and the Northern Cheyenne Tribe (collectively called the Tribe) from the district court's declaratory judgment that Colstrip Units 3 & 4 had "commenced construction" before June 1, 1975, within the meaning of EPA's then effective regulations and therefore were grandfathered from PSD review and permitting. Number 78–1140 is a petition by Montana Power to review the EPA's determination that, despite the district court's holding, the 1977 amendments to the Clean Air Act (1977 Amendments) subject Colstrip Units 3 & 4 to PSD review and permitting under a new and stricter definition of "commenced construction."

We have jurisdiction over the appeals by EPA and the Tribe under 28 U.S.C. § 1291 and over Montana Power's petition under § 307(b)(1) of the Clean Air Act. We reverse the judgment of the district court and affirm the EPA's determination.

I.

BACKGROUND

A. The PSD Regulations.

The EPA promulgated regulations under the Clean Air Act, effective on January 6, 1975, to prevent the significant deterioration of air quality.[3] 40 C.F.R. 52.21 (1975).

---

* Senior District Judge, Northern District of California.

1. The Clean Air Act was twice amended in 1977. Substantive amendments were enacted on August 7, 1977, Pub.L.No.95–95, 91 Stat. 712, and technical amendments were enacted on November 16, 1977, Pub.L.No.95–190, 91 Stat. 1405. The Act was recodified from 42 U.S.C. §§ 1857 et seq. to 42 U.S.C. §§ 7401 et seq. Because the relevant period here includes times both before and after the recodification, citations will be to the sections of the Clean Air Act itself.

2. In addition to Montana Power, the following are part of the consortium to build Colstrip Units 3 & 4 and are parties to this appeal: Puget Sound Power and Light Co.; Portland General Electric Co.; Washington Water Power Co.; and Pacific Power and Light Co.

3. The Clean Air Act amendments of Dec. 31, 1970, Pub.L.No.91–604, 84 Stat. 1676 (1970),

The purpose of the regulations was to restrict the increase in levels of particulate matter and sulfur dioxide in areas with air cleaner than that required by the national ambient air quality standards. Three classes of clean air areas were designated, in which differing additional amounts of these two pollutants would be allowed over levels existing on the baseline date.[4] Increases exceeding the specified limits were prohibited.

Enforcement of the restrictions was provided through preconstruction review and permitting of specified stationary pollution sources that included electric coal-burning power plants like Colstrip Units 3 & 4. If the EPA suspected a violation of the applicable class increments would occur, it refused the source a permit and prohibited construction.

The regulations contained a grandfather clause, excluding from PSD review and permitting those sources that "commenced construction or modification prior to June 1, 1975." *Id.* at 52.21(d)(1). "Construction" was defined as "fabrication, erection or installation of a stationary source." *Id.* at 52.21(b)(6). More important here is the definition of "commenced", which means that

> an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification.

*Id.* at 52.21(b)(7).[5]

If a source could establish it should be grandfathered, it might avoid additional expensive pollution control efforts. In some cases, exemption from PSD review and permitting might be the only way a source could be built in a particular location even

outlined a federal-state partnership in achieving the objectives of the Act. The EPA was responsible for designating air pollutants which endangered public health or welfare and for establishing national primary and secondary ambient air quality standards for each pollutant.

Each state was responsible for submitting an implementation plan to the EPA specifying how the standards would be achieved and maintained. If the state plan satisfied certain criteria, the EPA had to approve it; if not, the agency had to promulgate regulations establishing its own plan for the state.

No criterion for EPA approval required state implementation plans to preserve existing air quality cleaner than that mandated by national primary and secondary standards. Relying on the statement of purpose in the Act's preamble, however, the court in *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.1972), ordered the EPA to disapprove state plans insofar as they did not prevent the significant deterioration of air quality and to promulgate appropriate PSD regulations. The decision was affirmed on appeal. 4 E.R.C. 1815 (D.C.Cir. 1972); *aff'd by an equally divided court sub nom. Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

A number of challenges to the regulations heard in *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 540 F.2d 1114 (1976), proved unsuccessful. The Supreme Court granted certiorari on two issues but, after passage of the 1977 Amendments, vacated and remanded the cause "for further consideration in light of Clean Air Act Amendments of 1977 . . ., and to consider the suggestion of mootness." *Montana Power*

*v. EPA,* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977). The court of appeals remanded to the EPA for reconsideration. *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 540 F.2d 1114 (1977). The EPA has issued no final determination on the interplay of the regulations and the 1977 Amendments, and the parties here do not challenge the regulations' validity.

4.  EPA structured the classifications such that:

    Class I applied to areas in which practically any change in air quality would be considered significant; Class II applied to areas in which deterioration normally accompanying moderate well-controlled growth would be considered insignificant; and Class III applied to those areas in which deterioration up to the National standards would be considered insignificant.

    39 Fed.Reg. 42,510 (1974).

    The agency initially designated all clean air areas as Class II. 40 C.F.R. 52.21(c)(3)(i). A state could propose redesignation for any area within its boundaries, *id.* at 52.21(c)(3)(ii)–(iii), except Indian reservations, for which only "the appropriate Indian Governing Body" could propose a change. *Id.* at 52.21(c)(3)(v).

5.  As originally promulgated, the definition of "commenced" referred to a "*binding agreement or* contractual obligation." 39 Fed.Reg. 42,510, 42,515 (1974) (emphasis added). In an amendment meant to have "no substantive effect," the italicized words were deleted in June 1975 to give the definition quoted in the text. 40 Fed.Reg. 25,004 (1975).

if best available pollution control technology were used.

Before June 1, 1975, Montana Power had taken some significant preliminary steps for the construction of Colstrip Units 3 & 4. Plans for Units 1 & 2, being built in the same area planned for Units 3 & 4, included excess capacity for common facilities such as a surge pond, water intake structures, and power transmission lines to serve all four plants.

The company arranged for an environmental analysis of the Colstrip project in early 1973. It applied for a state construction permit in June under the Montana Major Facility Siting Act, Mont.Rev.Codes Ann. § 70–801 *et seq.* (Supp.1977), and executed several contracts.[6] Due to delay in processing the permit application, Montana Power entered into no other major contracts after October 1974. The Siting Act permit was finally granted in July 1976.[7]

In September 1975, the administrator of EPA's Region VIII informed Montana Power that its plans to build Colstrip Units 3 & 4 might be subject to PSD review and permitting, and requested more information about the project. The company responded in February 1976 and petitioned the EPA for a ruling on the applicability of the PSD regulations.

B. *The Strelow Memoranda.*

In evaluating Montana Power's request for exemption from PSD review and per-

mitting, Region VIII's administrator relied upon two memoranda written by Roger Strelow, then EPA's Assistant Administrator for Air and Waste Management, which interpreted the phrase "commenced construction".

The first memorandum, dated December 18, 1975, provided in relevant part:

[T]he term "commencement of construction" . . . refers to on-site construction. Ordinarily therefore only significant and continuous site preparation work such as major clearing or excavation or placement, assembly, or installation of unique facilities or equipment at the site should be considered a "program of construction or modification" for purposes of § 52.21(b)(7). However each case must be reviewed on its own facts.

. . .

. . . . .

There may also be situations where, although actual on-site work has not commenced or been contracted for, the source is so irrevocably committed to a particular site that it should be considered as having commenced construction. Such situations could include sources which are only a few days or weeks from commencing on-site construction or sources which . have contracted for or constructed unique site specific facilities or equipment which

---

6. Montana Power issued a letter of intent to Westinghouse Electric Corp. in June 1973 for the purchase of two turbine generators, at a cost exceeding $45 million. Shortly thereafter, it appointed Bechtel Power Corp. as the architect and engineer for the units. In November, C.T. Main, Inc. received the engineering responsibility for the transmission system.

In the first three months of 1974, the company issued a purchase order to Combustion Engineering, Inc. for two steam generators costing $67 million, engaged Northern Testing Laboratories for soil exploration preparatory to on-site construction, and ordered reinforcing steel for the plans from Paper Calmenson & Co.

Later in 1974, the company ordered condensers and feedwater heaters from Westinghouse for nearly $4 million, closed a contract for coal silos, and ordered additional steel and bleeder trip valves.

7. Intervenors petitioned the District Court of Montana to review the issuance of the permit by the Board of Natural Resources and Conservation. The court reversed the decision of the Board and enjoined construction of Colstrip Units 3 & 4. *Northern Plains Resource Council v. Board of Natural Resources and Conservation,* No. 40462 (Mont. 1st Dist., Mar. 3, 1978).

On appeal, the Montana Supreme Court dissolved the injunction pending final disposition. It recently issued its opinion, affirming and reversing in part. 594 P.2d 297 (Mont. 1979). The court remanded to the Board of Natural Resources for additional findings of fact and conclusions of law on several matters, to be made within 90 days, and suspended the Siting Act permit pending compliance with the order.

Although the validity of the permit is still in doubt, we will assume for our purposes that Montana Power received a valid Siting Act permit in July 1976.

are not yet being installed on-site. Such situations will be rare but may be taken into account in determining whether the source is in effectively the same position as if it had commenced on-site construction.

. . . . .

Finally, 40 CFR § 52.21(b)(7) states that an owner or operator has commenced construction not only when he has undertaken a continuous program of construction or modification himself but also when he has entered into a "contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification". The question of whether a contract represents a "contractual obligation" will depend upon the unavoidable loss that would be suffered by a source if it is required to cancel such contract. . . . [W]here the contract may be cancelled or modified at an *insubstantial loss* to the plant operator, the proposed source should not be allowed to escape review under these regulations. The determination of whether a source will suffer a *substantial loss* if the contract were terminated and therefore whether there is, in fact a "contractual obligation", must be made on a case-by-case basis as there are no general guidelines that would cover all situations. [Emphasis added.]

The second memorandum of April 21, 1976, clarified what was necessary for a contractual obligation to qualify a source for exemption from PSD review and permitting:

[A]s a general rule, for one to qualify for the contractual exemption, *he must have contracted for continuous on-site construction work.* The discussion [on the "contractual obligation" exemption in] my December 18 memo is *not* intended to provide exceptions to this general rule. That discussion relates to situations in which *even though* a "contract" for on-site work were executed prior to June 1975, the "contract" *might still not qualify* the source for an exemption [because the source would experience no substantial loss].

Accordingly, the mere fact that a source had contracted for the fabrication of a piece of equipment prior to June 1975 (i. e., placing an order for a boiler) would *not* ordinarily exempt the source. Only if a non-site-work contract could fit within the "irrevocably committed" exception . . . would it qualify the source for an exemption from review. As my memo indicates, such situations should be "rare."

The second memorandum also stated that the absence of a state construction permit should be a "relevant factor" in determining whether a source should be exempt from PSD review and permitting because it was irrevocably committed to a specific site.

Thus, using the Strelow Memoranda to interpret its regulations, the EPA would grandfather a source from PSD review and permitting only if, by June 1, 1975, the source had: (1) actually begun a continuous program of on-site construction; (2a) contracted for a continuous program of on-site construction which could not be terminated without substantial loss; or (2b) contracted for construction not amounting to a continuous program of *on-site* construction, but which nevertheless irrevocably committed the source to a specific site.[8]

---

**8.** The parties seemingly list numbers (2a) and (2b) as distinct and separate reasons for exemption. A reading of the Strelow Memoranda could give the impression they are unrelated, but careful examination indicates they are two sides of the same coin.

Both fall under the general umbrella of the "contractual obligation exemption" described in the regulations. As interpreted in the Strelow Memoranda, the regulations permit a source to be grandfathered on either of two types of contractual obligations: if the contracts are for on-site construction; or, when they are for non-site work, if they fall within the irrevocable commitment category.

Because both fall under the contractual obligation exemption, the substantiality of loss if the contracts were cancelled or modified is relevant to both. Thus, if a source had contracted for specific equipment to be built off-site (probative of an irrevocable commitment to a specific site), and the contract could not be

## C. Applicability of the PSD Regulations.

Region VIII's administrator advised Montana Power on February 26, 1976, of the EPA's decision that Colstrip Units 3 & 4 were subject to PSD review and permitting. A following letter in May affirmed that decision and gave the reasons.[9] In EPA's view, before June 1, 1975, Montana Power: (1) had not begun actual on-site construction; (2) had not received the necessary state preconstruction permits; and (3) had not demonstrated an irrevocable commitment to a specific site, partly because it would suffer no substantial loss from the termination of its contractual obligations.

The EPA based its conclusion that the company would suffer no substantial loss on a ratio of unavoidable losses to total project cost. It found that contract payments and cancellation charges amounting to $8.7 million were clearly "contractual obligations" for the construction of Units 3 & 4 and that another $13.6 million was arguably in this category.[10] It rejected claims totaling an additional $106.5 million.[11] Using a total project cost of $790 million, the EPA calcu-

lated that the company's contractual obligations constituted 2.8 percent of the project's cost and concluded that this sum was not substantial.

Montana Power sought judicial review of the EPA's final determination. In January 1977, the court granted the company declaratory, but not injunctive, relief,[12] holding that it had commenced construction of Colstrip Units 3 & 4 before June 1, 1975, and was therefore exempt from PSD review and permitting. *Montana Power v. EPA,* 429 F.Supp. 683 (D.Mont.1977).

In reaching its holding, the court concluded that the EPA's determination was arbitrary and capricious because the agency recently had exempted two other electric generating plants not as far advanced as Colstrip Units 3 & 4. *Id.* at 699–701. It also concluded that, although the use of a ratio in determining substantiality of loss is itself not necessarily arbitrary and capricious, its application here was because of the huge sum of money, in absolute terms, already committed to the units' construction.[13] *Id.* at 701.

terminated without substantial loss, the source could be exempt from PSD review and permitting even though no contractual obligation for a continuous program of *on-site* construction existed. This is the basis of Montana Power's claim of exemption.

9. The regional administrator had the benefit of only the first Strelow Memorandum before his February decision. He received the second memorandum before writing the May letter affirming his original decision and explaining the reasons.

10. The $13.6 million figure included the cost of design studies by Bechtel Power Corp., environmental studies, prorated excess capacity of Colstrip Units 1 & 2, and an engineering study and design for a 500 Kilovolt transmission line.

11. Among the claims rejected by the EPA as non-contractual obligations were the cost of the application fee for a Siting Act permit, a convertible 230 Kilovolt transmission line, and administration and legal costs. The agency also rejected a claim of $93 million in anticipated additional costs due to inflation if the units' site was changed and construction delayed.

12. The court found that, although Montana Power had shown a strong likelihood of success on the merits, it had not demonstrated

that a denial of injunctive relief would cause it irreparable harm, that an injunction would not significantly damage the opposing parties, and that the public interest weighed in its favor. The court concluded:

> A basic proposition is that the fundamental function of a preliminary injunction is to preserve the *status quo* pending a determination of the action on the merits. . . . In this case, the plaintiffs are asking for a preliminary injunction which would allow them to commence on-site construction of a major new power plant. At the commencement of this action, the Power Company had not begun on-site construction at the Units Three and Four sites. Thus, an injunction at this point would allow a severe alteration in the *status quo*. Preliminary injunctive relief at this point would allow the plaintiffs substantially all the injunctive relief they could obtain on a final determination of the merits and must, therefore, be denied.

429 F.Supp. at 702 (citations omitted).

13. The court also found that "[t]he agency determination in this case fails to allow committed funds for planning." 429 F.Supp. at 701. It apparently thought that the EPA had not considered the $13.6 million in the "arguably" contractual commitments category when computing the ratio of unavoidable losses to total project cost.

*D. 1977 Amendments.*

While the district court's judgment was on appeal, Congress passed the 1977 Amendments, effective August 7, 1977. These provided for the first time explicit *statutory* authority for the prevention of significant deterioration of air quality, a subject previously covered only in EPA's regulations.

The amendments generally preserved the structure of the PSD regulations.[14] But, among other modifications,[15] the amendments enacted a stricter definition of "commenced":

> (2)(A) the term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.
>
> (B) The term "necessary preconstruction approvals or permits" means those permits or approvals, required by the permitting authority as a precondition to

undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

Clean Air Act § 169(2).

Although the definition in the amendments is substantially different on its face from the definition in the regulations, it is generally consistent with the interpretation of the regulation definition in the Strelow Memoranda. A significant difference is that the possession of necessary preconstruction permits, only a "relevant factor" in determining if a source had commenced construction under the regulations, is required for such a determination under the 1977 Amendments.

The transition from the regulatory to the statutory scheme is outlined in § 168. Section 168(a) provides that, until a state's implementation plan is revised to conform to the Act's new PSD procedures, the pre-amendment regulations will remain in effect for that area, except as provided in subsection (b).[16]

Section 168(b) also provides that, in the case of a source which commenced construction—under the new definition of § 168(a)—after June 1, 1975, and before the effective date of the 1977 Amendments on August 7, 1977, PSD review and permitting "shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to the enactment of the Clean Air Act Amendments of 1977." [17]

---

The opposite is true. The 2.8% of total cost figure is based on a contractual commitment of $22.3 million and includes the "arguably" category. On appeal, the EPA and Montana Power agree on these figures.

14. The amended Clean Air Act retains the system of three classes of clean air areas with different levels of allowable pollution increments and still requires major pollution sources, including coal-fired electric generating plants, to obtain a PSD permit before beginning construction. A permit is granted only if the best technology is used and if the source will not violate the pollution increment limits in its immediate and surrounding class areas.

15. The 1977 Amendments tightened the permissible incremental limits for the three classes of clean air areas, § 163, designated certain national parks and wilderness areas as mandatory Class I areas, § 162(a), reduced EPA's

authority to review proposed class redesignations substantively, § 164(b)(2), and toughened the PSD review and permitting requirements, § 165.

16. Even before a state submits a new implementation plan, pre-amendment regulations are deemed amended to conform to immediately applicable sections of the Act: § 162(a) (classifying certain national parks and wilderness areas as mandatory Class I areas), § 163(b) (establishing the allowable pollution increments for the three classes of clean air areas), and § 164(a) (prohibiting reclassification of certain areas to Class III).

17. The text of § 168 reads:
(a) Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this

On November 3, 1977, EPA amended its PSD regulations to reflect the immediately effective changes required by the 1977 Amendments, including the § 169(2) definition of "commence." 42 Fed.Reg. 57,459 (1977). It also proposed amendments to the regulations, to take effect later, which would incorporate the other changes enacted by Congress.[18] 42 Fed.Reg. 57,471, 57,-479 (1977).

The proposed regulation amendments would "greatly expand the coverage of the EPA's current regulations and generally impose more stringent requirements for pollution sources seeking to construct or modify in clean air areas." 42 Fed.Reg. 57,479 (1977). A source would not be subject to the *new* PSD regulations if it had obtained a final PSD permit by March 1, 1978, and commenced construction before December 1, 1978.[19] *Id.* at 57,481. Somewhat behind schedule, the EPA published its final amendments to the PSD regula-tions on June 19, 1978, conforming the regulations to the remaining requirements of the 1977 Amendments. 43 Fed.Reg. 26,388 (1978).

The EPA issued a final determination on November 29, 1977, that Colstrip Units 3 & 4 had not timely commenced construction under § 169(2) of the Clean Air Act because Montana Power had not received all necessary preconstruction approvals or permits. The agency therefore found the plants were subject to PSD review and permitting under the 1977 Amendments. 42 Fed.Reg. 60,784 (1977).

Montana Power petitioned this court for review of EPA's determination and, without prejudice to its contentions on appeal, continued its efforts to obtain a PSD permit for Units 3 & 4. On June 12, 1978, EPA denied the company's application because it determined the units would violate the Class I pollution increments applicable to the Northern Cheyenne Reservation.[20]

part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this Act prior to enactment of this part shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b).

(b) If any regulation in effect prior to enactment of this part to prevent significant deterioration of air quality would be inconsistent with the requirements of section 162(a), section 163(b) or section 164(a), then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of 'commenced' in section 169(2)) after June 1, 1975, and prior to the enactment of the Clean Air Act Amendments of 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to the enactment of the Clean Air Act Amendments of 1977.

**18.** EPA's decision to amend its PSD regulations to give immediate effect to certain requirements of the 1977 Amendments, while postponing action on other necessary changes, was the result of an apparent conflict in §§ 165 and 168 regarding the effective date of the stricter PSD review and permitting procedures in the amendments. The EPA's accommodation of the conflict was upheld in *Citizens to Save*

*Specer County v. EPA,* 195 U.S.App.D.C. 30, 600 F.2d 844 (1979).

**19.** It is difficult to remember which PSD regulations a source might avoid if it commenced construction by a certain date. In proposing the last amendments to the regulations that would conform them to the requirements of the 1977 Amendments, the EPA attempted to clarify:

It will be important in some cases to determine whether a source has "commenced" construction, as defined in Section 169(2), by a certain date. If a source commenced construction prior to June 1, 1975, it may be exempt from PSD review altogether. If a source commenced construction prior to August 7, 1977, it may be exempt from the immediately effective changes to EPA's PSD regulations. If a source will commence construction prior to December 1, 1978, it may be exempt from the new PSD requirements being proposed today (provided it obtains a final PSD permit approval by March 1, 1978).

42 Fed.Reg. 57,479, 57,481 (1977).

**20.** Montana Power had originally applied for a PSD permit for Units 3 & 4 in July 1976 to guard against the possibility of losing its exemption argument. Although the EPA determined in September that the units would meet the Class II limits then applicable, it withheld final decision pending receipt of an anticipated application to redesignate the Northern Cheyenne Indian Reservation, 15 miles away, as a Class I area.

## II.

### ISSUES

We face two issues:

(1) whether the district court erred in reversing EPA's determination that Colstrip Units 3 & 4 were subject to PSD review and permitting under the regulations because construction had not commenced before June 1, 1975; and

(2) whether the EPA erred in concluding Montana Power had not commenced construction of the units under § 169(2), thus subjecting them to PSD review and permitting under the 1977 Amendments.

## III.

### WHETHER CONSTRUCTION COMMENCED UNDER THE REGULATIONS

The district court focused on EPA's application of a "substantial loss test", read into the regulations by the Strelow Memoranda, in holding the agency's refusal to exempt Colstrip Units 3 & 4 from PSD review and permitting to be arbitrary and capricious. Although the EPA cited other reasons for its refusal, also challenged by Montana Power here,[21] we need not reach those questions because of our disposition of the substantial loss issue.

The Tribe proposed the redesignation in March 1977, and the EPA approved it in August. Montana Power is an intervenor in a case now before this court, *Nance v. EPA*, No. 77–3058, challenging the propriety of the reclassification.

After vacillating in its decision, first advising the company it would deny the permit and then that it would grant it under certain conditions, the EPA announced after an extended period for public comment that it was denying the permit because of an expected violation for a few days each year of the Class I sulfur dioxide limits for the reservation. Montana Power also intervened in another case on appeal, *Puget Sound Power and Light Co. v. EPA*, Nos. 78–2821, 78–3234, challenging the permit denial.

**21.** Montana Power takes particular issue with the interpretation of the regulations in the second Strelow Memoranda making possession of state construction permits a "relevant fac-

### A. Degree of Deference.

■ A reviewing court may set aside an agency action that is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A) (1976). When making this determination, the court ordinarily must give agency interpretations of its regulations upon which the action is based the degree of deference described in *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965):

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. . . . When the construction of an *administrative regulation* rather than a statute is in issue, *deference is even more clearly in order.*

*Id.* at 16, 85 S.Ct. at 801 (emphasis added). *Accord, Burglin v. Morton*, 527 F.2d 486, 490 (9th Cir. 1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976); *Brubaker v. Morton*, 500 F.2d 200, 202 (9th Cir. 1974). *See also Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

■ The district judge recognized that it is not the court's province to substitute its judgment for that of the agency to which is committed the interpretation of a statute or regulations. 429 F.Supp. at 695, 697. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28

tor" in determining whether a project is irrevocably committed to a specific site. The company contends that this interpretation exceeds the scope of the regulations, which have no mention of state permits in the definition of "commence."

The EPA responds that the company may not accept the Strelow Memoranda's interpretation of the regulations by claiming an "irrevocable commitment" exemption while asserting the memoranda are invalid insofar as they make possession of state permits a relevant factor in determining the degree of commitment.

The Tribe agrees with Montana Power that the second memorandum is inconsistent with the regulations, but for a different reason. It contends the possession of state permits should be a requirement, not merely a relevant factor, in determining the degree of commitment.

L.Ed.2d 136 (1971); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 405–409, 541 F.2d 1, 33–37, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Sierra Club v. EPA,* 176 U.S.App.D.C. 335, 344, 540 F.2d 1114, 1123 (1976), *vacated and remanded* 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977) (in light of 1977 Amendments); *Frommhagen v. Klein,* 456 F.2d 1391, 1393 (9th Cir. 1972). The court concluded, however, that

> when an analysis of an agency's activities involves a question concerning the meaning of a statutory term, the application of a statutory term to facts, or an agency interpretation of a statute, then the breadth of judicial review is much wider.

429 F.Supp. at 695. It also found that the Strelow Memoranda were merely intra-agency, non-public guidelines to interpret the PSD regulations and, as such, were not entitled to the usual degree of deference.

■ We are aware that a court reviewing an agency action "must consider whether the decision was based on a consideration of the relevant factors" and that the "inquiry into the facts is to be searching and careful." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. But, "the ultimate standard of review is a narrow one" and the objective of the inquiry is to determine "whether there has been a clear error of judgment" by the agency. *Id.* *See also Bone v. Hibernia Bank,* 493 F.2d 135, 139–40 (9th Cir. 1974); *Hughes Air Corp. v. CAB,* 482 F.2d 143, 145–46 (9th Cir. 1973); *United States v. Whelan,* 463 F.2d 1093, 1094 (9th Cir. 1972).

■ Unlike the district court, we do not believe the standard set forth in *Tallman* allows the courts any broader grant of review when an agency determination "concern[s] the meaning of a statutory term", as long as the agency does not exceed its own statutory authorization. Here, the EPA was not interpreting a statute, but rather its own regulations, which is entitled under *Tallman* to even more deference.

■ Similarly, even though we agree with the district court that the Strelow Memoranda "were merely intra-agency, non-public guidelines", we are unpersuaded they should be given any less than normal deference as long as they are a reasonable interpretation of the PSD regulations.

■ While we express no opinion about the other parts of the Strelow Memoranda, we conclude that a "substantial loss test" is reasonable to determine if an owner "has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification."

We agree with the Tribe that, if the Memoranda alter the meaning of the regulation at all in this respect, it is to liberalize the regulation's requirements.[22] Thus, if a source executes contracts that could not be cancelled or modified without substantial loss, indicating an irrevocable commitment to a specific site, it would be unnecessary under the EPA's interpretation for the contractual commitment to be either continuous or inclusive of completion.

It is not enough, however, to note that the district court applied an incorrect standard of deference to the Strelow Memoranda. Nor is it sufficient for us to conclude that passing a substantial loss test is a reasonable prerequisite to being grandfathered under the irrevocable commitment exception to PSD review and permitting.[23] Applying the proper degree of deference, we still must decide if the substantial loss test, as applied here to Colstrip Units 3 & 4, was arbitrary or capricious.

---

22. The Tribe reads the regulations literally to require contracts for actual commencement and completion of a continuous program of construction. It argues the regulations "simply do not permit construction to be deemed to have commenced merely because sums of money, large or small, have been expended."

 Although we disagree with the Tribe's contention that the EPA exceeded its authority by including a substantial loss test in the regulations, we agree that the EPA's interpretation liberalized the regulation's facial meaning.

23. As discussed *infra,* the district court and Montana Power concede that some concept of substantiality of loss is properly read into the regulations.

*B. Prior Decisions.*

Before the EPA's final determination in May 1976 refusing to grandfather Colstrip Units 3 & 4, the agency exempted two other power plants in arguably similar contractual positions. The apparent inconsistency in interpreting the regulations clearly influenced the district court.

In May 1975 the Region X administrator notified Portland General Electric (PGE) that its plant at Boardman, Oregon was exempt from PSD review and permitting. The finding that PGE had obligated itself to complete within a reasonable time a continuous program of construction was based on a contract to purchase a turbine generator.

After the first Strelow Memorandum was issued, the Region VIII administrator ruled in March 1976 that Pacific Power and Light Company's Jim Bridger Unit 4 was "irrevocably committed" to its site as of June 1, 1975, because it had been designed to share facilities with existing units at that location and had executed contracts involving $5.4 million in cancellation charges. The plant was grandfathered from PSD review and permitting.

Montana Power argues that before June 1, 1975, it had contracted for a turbine generator for each plant, designed Units 3 & 4 to share facilities with Units 1 & 2 then under construction, and entered into contracts that could not be cancelled without penalties of $8.7 million. It contends it was further committed to a program of construction than were the two companies building the grandfathered power plants and that Units 3 & 4 therefore were entitled to exemption from PSD review and permitting.

Although the EPA and the Tribe attempt to distinguish the other two rulings on their facts,[24] we may assume for our purposes that Montana Power's contractual commitment to construct Colstrip Units 3 & 4 was at least as advanced as, if not greater than, those for the Boardman and Bridger plants. We may also assume, as the district court found, that the prior decisions were consistent with the regulations and that the Strelow Memoranda demonstrated a change in policy. The question remains, however, what significance these apparently inconsistent determinations should have when evaluating the EPA's refusal to exempt Units 3 & 4.

The district court concluded that since the EPA "ha[d] switched horses in midstream", the policies implicit in the earlier two decisions, rather than in the Strelow Memoranda, should have been used to evaluate Montana Power's request for PSD exemption.[25] 429 F.2d at 700–01. Although

---

**24.** The Tribe argues the Boardman decision is distinguishable because Portland General Electric had received a state construction permit before June 1, 1975. Montana Power had no state permit for Colstrip Units 3 & 4 until July 1976.

The company responds that there is no indication possession of a state permit was even considered in the Boardman decision since the regulations did not clearly require it and the Strelow Memoranda, which made possession a "relevant factor" in determining if a source was sufficiently committed to a site to be grandfathered, had not yet been issued.

The Tribe attempts to distinguish the Bridger ruling, asserting the EPA believed at the time of its decision that the total Bridger cost would be $60 million and that $5.4 million in cancellation charges would have amounted to 9% of the total cost. The EPA also asserts it had this belief and offers similar calculations in its attempt to distinguish the ruling.

This proposition is difficult to sustain. Sixty million dollars is a meager sum for a major power plant. Moreover, the EPA's exemption letter to Pacific Power and Light stated that "the record reflects that prior to June 1, 1975, contracts for major components of the system had been entered into resulting in a *commitment* of approximately $60,000,000 which could not be breached without incurring cancellation charges in excess of $5,400,000." (Emphasis added.) Thus, the EPA properly understood that $60 million was not the total cost of the Bridger project, but rather was the total of contract commitments by June 1, 1975.

**25.** The court implied that Montana Power had relied on the EPA's interpretation of the regulations before the Strelow Memoranda, as reflected in the Boardman and Bridger decisions.

It spoke of the weight to be given the memoranda:

The principle of *Udall* that deference is due the agency's interpretation of the regulations addresses the extra-agency statements, not

admitting that the EPA is not absolutely bound by its prior rulings, Montana Power argues that a definite shift in the interpretation of the regulations occurred, entitling the agency's determination that Units 3 & 4 had not met the exemption prerequisites to little deference.

Both the district court and Montana Power misconstrue the scope of judicial review of agency action. Even if the action involves a new interpretation of a regulation, the traditional standard of deference announced in *Tallman* applies:

> The scope of our review of an administrative order wherein a new principle is announced and applied is no different from that which pertains to ordinary administrative action. The wisdom of the principle adopted is none of our concern. See *Board of Trade [of Kansas City, Mo.] v. United States*, 314 U.S. 534, 548 [62 S.Ct. 366, 373, 86 L.Ed. 432.] Our duty is at an end when it becomes evident that the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress. See *National Broadcasting Co. v. United States*, 319 U.S. 190, 224 [63 S.Ct. 997, 1013, 87 L.Ed. 1344.]

*SEC v. Chenery Corp.*, 332 U.S. 194, 207, 67 S.Ct. 1575, 1582, 91 L.Ed. 1995 (1947).

■ The agency is not absolutely bound by its prior determinations, but rather may adjust its policies and rulings in light of experience:

> "Cumulative experience" begets understanding and insight by which judgments . . . are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale

than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process.

*NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953). *Accord, NLRB v. Weingarten*, 420 U.S. 251, 264–66, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *FCC v. WOKO, Inc.*, 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Santos v. INS*, 375 F.2d 262, 265 (9th Cir. 1967).

The Boardman decision was made before either of the Strelow Memoranda was issued. It did not represent a settled agency policy. The EPA has since admitted it mistakenly exempted that plant from PSD review and permitting on the basis of a turbine generator contract.

■ In light of our limited scope of review and the prerogative of the agency to evolve the interpretation of its regulations, we cannot say the agency was bound by that decision or improperly disregarded it in ruling on Colstrip Units 3 & 4 once national guidelines in the Strelow Memoranda had been issued. Nor can we say that the Colstrip decision is entitled to any less deference because of the Boardman plant ruling.

The Bridger plant was exempted from PSD review and permitting under the "irrevocable commitment" exception explained in the first Strelow Memorandum. But the decision came prior to the second Memorandum that clarified the kind of contracts necessary for a sufficient contractual commitment to exist and emphasized that the situations in which a plant could be irrevocably committed to a site should be "rare."

---

the intra-agency guidelines. An agency's public acts bear more weight than its private working papers. To overcome a good faith reliance on the former, the record must affirmatively reflect a basis to give deference to the latter. None exists in this case.

429 F.Supp. at 698. Later the court concluded: The intercorporate communication networks in industries like the utility industries are sophisticated and thorough. Thus, a very logical and a good faith interpretation by the Montana Power Company would be that its contractual commitments would exempt

Units Three and Four from the preconstruction review.

*Id.* at 700.

There is no basis in the record for finding that Montana Power relied on the Boardman and Bridger rulings in developing Colstrip Units 3 & 4 to avoid PSD review and permitting. Nor does the company make that contention. It would have been difficult to do so. The Boardman decision was announced two weeks *before* the grandfathering cut-off date and the Bridger decision came nine months later.

■ In view of this clarification and the power of the agency to reasonably depart from prior rulings in light of experience, we are unable to conclude with the district court that this ruling necessarily "show[s] that an agreement to purchase a turbine generator, the sharing of on-site facilities such as a water system and a transmission system, and contracts for major components amount[s] to a commencement of construction within the meaning of 40 C.F.R. 52.-21(b)(7)." 429 F.Supp. at 696. The EPA is free to make reasonable changes in the interpretation of its regulations and in the application of the regulations to specific cases.

We realize that Montana Power was first notified it was subject to PSD review and permitting on February 26, 1976, prior to the decision exempting the Bridger plant. But the letter that explained the basis of the agency's ruling was not sent until May, after the second Strelow Memorandum was issued.

■ Whether the agency was mistaken in its application of the first Strelow Memorandum to the Bridger plant, or it found a new and different rationale in the second Memorandum for refusing to exempt Colstrip Units 3 & 4, makes no difference. Providing the EPA does not single out the Colstrip plants for discriminatory treatment under a peculiarly harsh interpretation of its regulations and the Strelow Memoranda,[26] we cannot say in the absence of any other evidence alleged to show arbitrary or capricious agency action that EPA was bound by its Bridger decision or that the Colstrip ruling is entitled to any less than normal deference. Cases cited to the contrary by Montana Power are either consistent with this conclusion or are distinguishable.[27]

26. In its proposed rules to conform the PSD regulations with the requirements of the 1977 Amendments, published just before the EPA's final determination on Colstrip Units 3 & 4, the agency described for public comment a "10% test" by which substantial loss could be measured:

Under this test, if the amount the owner would have to pay to cancel construction agreements (as of the date in question) would total more than 10% of the total project cost for the source in question, the loss would be deemed "substantial."

42 Fed.Reg. 57,479, 57,481 (1977).

In the commentary accompanying the new PSD regulations promulgated on June 19, 1978, the EPA noted the result of the public comments and outlines its current practice:

Several comments were received, particularly from industry, on the "10 percent" test. Many of the commentators thought that the 10 percent rule was arbitrary since they regarded even smaller percentage losses on a $100,000,000 project as clearly being substantial. In response to these comments, EPA has abandoned the proposed 10 percent test as a firm rule. However, in order to help minimize administrative burdens and to provide some certainty, the Administrator will consider a loss as being substantial if it would be more than 10 percent of the total project cost. Whether a loss equal to or less than 10 percent is substantial will be determined on a case-by-case basis. The dominant consideration will be whether the "source has so committed itself, financially and otherwise, to the use of a particular site for a particular facility that relocation is not an option and delay or substantial modification would be severely disruptive." [S.Rep. No. 95–127, 95th Cong., 1st Sess. 32 (1977)]. 43 Fed.Reg. 26,388, 26,396 (1978).

The current practice is not inconsistent with that used to measure Montana Power's substantiality of loss for Units 3 & 4.

27. The Supreme Court cases cited by Montana Power have dealt with a deviation from "long established" practice without a sufficient explanation of "the policy it is now pursuing," *Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 805–06, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973); a question regarding which the "expertise" of the agency "is of limited value when the narrow legal issue [whether a cause of action should be implied] is one peculiarly reserved for judicial resolution," *Piper v. Chris-Craft Industries*, 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977); and a case in which the "principle of according deference to administrative practice" did not apply because "the relevant statutory language" was not "unclear or susceptible of differing interpretations," *Shea v. Vialpando*, 416 U.S. 251, 262 n. 11, 94 S.Ct. 1746, 1754 n. 11, 40 L.Ed.2d 120 (1974).

Here, the EPA's interpretation of its regulations that led to the Boardman and Bridger decisions was not a "long established" practice. The "policy it is now pursuing" is clear, and is not inconsistent with the Montana Power ruling. *See* note [25] *supra*. Unlike the court in *Piper*, we are dealing with an area in which the

We agree with the district court in a factually similar case that, under the circumstances here, it does not matter that the EPA "switched horses in midstream" as long as it "was astraddle a good horse when it reached the other side." *Gulf Power Co. v. EPA*, PCA No. 77–0477 (N.D.Fla. May 2, 1978).

C. *Use of a Ratio.*

The district court allowed that some concept of substantiality of unavoidable loss is reasonable in determining if a source's contractual commitment is the functional equivalent of having commenced actual construction. But the court found that, under this fact situation, use of a ratio of unavoidable loss to total project cost to determine substantiality was improper:

> The ratio itself is not arbitrary or capricious. Its application can be. The function of the ratio is to establish a proper balance between entrepreneurial risks and social and economic utility. . . . [W]ith those cases that have not commenced on-site construction but have gone past the intracorporate planning stage . . ., what the agency must do is reach the equilibrium point between investor risk and irrevocable external commitments that amount to a continuing program of construction, a program based not on speculation but upon a well-designed construction plan.

429 F.Supp. at 701. The court concluded that the "assumption that 'substantial' must be measured in relative rather than absolute terms . . . results in a capricious application of the policy designed to strike a balance between investor risk and social utility." *Id.*

Although Montana Power apparently agrees that the Strelow Memoranda properly read into the regulations a "substantial loss test", it argues that nothing in the memoranda justified use of a ratio to determine substantiality in its case. It concedes that, despite the lack of reference in the memoranda, a ratio might be the fairest way to measure substantial loss for smaller projects, but argues that a ratio works an injustice on larger projects in which the stakes are higher. It contends that its unavoidable loss exceeding $22.3 million as of June 1, 1975, was clearly substantial in absolute terms.

Had we such an option, we might as a matter of policy define "substantial loss" to include significant cancellation or modification costs, in absolute terms, that only constitute a small percentage of the total anticipated cost of a large project such as Colstrip Units 3 & 4. In light of the deference we must accord the EPA's interpretation of its own regulations, however, we do not have that option.

The EPA could reasonably conclude that the developers of a large power plant were not "irrevocably committed" to the project at a given site unless their investment had reached a specific percentage of the total cost, regardless of the amount already expended. Here, $22.3 million is clearly a significant sum, but it was only 2.8% of the total cost, a relatively modest investment in terms of the overall project.

expertise of the EPA, in defining terms consistent with the policy of the Clean Air Act, is particularly helpful. Finally, the definition of "commence construction," unfortunately, is certainly "unclear" and "susceptible of differing interpretations."

Our conclusion is consistent with earlier holdings of this court when we found that the weight to be given to an administrative regulation depends upon "its consistency with earlier and *later* pronouncements," *Martinez v. Marshall*, 573 F.2d 555, 559–60 (9th Cir. 1978) (emphasis added), *citing Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), and that the agency "may not depart sub silentio from its usual rules of decision to reach a different, unexplained result *in a single case*," *NLRB v. Silver Bay Local Union No. 962*, 498 F.2d 26, 29 (9th Cir. 1974) (emphasis added), *citing NLRB v. International Union of Operating Engineers, Local 925*, 460 F.2d 589, 604 (5th Cir. 1972).

The facts in *United States v. Union Oil Co.*, 549 F.2d 1271 (9th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977), are distinguishable. There the court refused to consider an agency interpretation of a statutory term primarily because the interpretation was written decades after the act was passed and therefore could not "reflect an agency view contemporaneous with the passage of the Act." *Id.* at 1280 n. 19. Such was not the case here.

The EPA is not required to view the substantiality of loss from the stockholder's perspective, which might include sums significantly smaller than that committed by Montana Power here. It may use a more objective standard such as a ratio. It does not matter that the EPA apparently failed to use a ratio in the Boardman and Bridger plant decisions. As we have discussed, an agency may make reasonable changes in the interpretation of its regulations in light of experience.

Neither the district court nor Montana Power suggested a formula by which substantiality of loss could be measured by a ratio on some projects, particularly on smaller ones, but by the absolute amount of unavoidable loss for larger power plants such as Colstrip Units 3 & 4. Nor was it practical for them to have done so. The determination of substantiality of loss for exemption from PSD review and permitting must be made on a case-by-case basis and is properly consigned to the sound discretion of the EPA.

Even if the EPA's objective in determining substantiality of loss was to "strike a balance between investor risk and social utility," we cannot say that the agency showed a "clear error of judgment," *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814, in using a ratio of unavoidable loss and total project cost to strike the balance. The district court merely substituted its judgment for that of the agency. As the Supreme Court noted in another context, the agency's "interpretation may not be the only one permitted by the language of the [regulations], but it is quite clearly a reasonable interpretation; courts must therefore respect it." *Tallman*, 380 U.S. at 4, 85 S.Ct. at 795.

*D. Notice and Hearing.*

The district court interpreted the alleged policy changes effected by the Strelow Memoranda to be an exercise of EPA's rulemaking function. Because the memoranda were issued without notice or hearing, it found them to be adopted improperly.

▮ We conclude, however, that the memoranda were merely "interpretive rules" under 5 U.S.C. § 553(b)(3)(A) (1976), and that rulemaking procedures were unnecessary.

IV.

## WHETHER CONSTRUCTION COMMENCED UNDER THE 1977 AMENDMENTS

Although we have determined that Colstrip Units 3 & 4 are subject to PSD review and permitting under the pre-amendment regulations,[28] we still face the question of how the 1977 Amendments affect the project.

No party discussed adequately the interrelationship of the pre- and post-1977 Amendment PSD review and permitting schemes. The EPA and the Tribe imply they would be "satisfied" if Units 3 & 4 are subject to review under either scheme. In light of changes in the regulations after the 1977 Amendments, however, which could make more difficult securing a PSD permit for the units, we consider Montana Power's petition for review of the EPA's determination that it had not commenced construction under the 1977 Amendments before August 7, 1977.

*A. Refining the Issue.*

The new definition of "commence" in the 1977 Amendments generally follows the Strelow Memoranda interpretation of the pre-amendment regulatory definition, with one significant distinction.

As with the Memoranda interpretation, an owner or operator must *either* begin "a continuous program of physical on-site construction" *or* enter into contractual obligations, "which cannot be canceled or modified without substantial loss . . ., to undertake a program of construction of the

---

28. "Pre-amendment regulations" are those first promulgated in 1974 and in effect before enactment of the 1977 Amendments. Later changes in the regulations, made in response to the 1977 Amendments, should be distinguished carefully from the earlier ones.

facility to be completed within a reasonable time."[29]  Clean Air Act § 169(2)(A).

The difference is that, whether a source "has obtained all necessary preconstruction approvals or permits required by Federal, State or local air pollution emissions and air quality laws or regulations," *id.*, is no longer merely a "relevant factor" in determining if a source is irrevocably committed to its site, but rather is a prerequisite to satisfying the definition of "commence" irrespective of how the source claims its exemption.

Section 168 bridges the gap between the regulatory and statutory definitions of "commence."  It provides that if a source meets the statutory definition *between* June 1, 1975, and August 7, 1977, "the review and permitting of such facility shall be in accordance with" the pre-amendment PSD review and permitting procedures in the regulations.

Thus, three time periods are relevant under the 1977 Amendments to determine the effect of PSD review and permitting on a given source.  If the source "commenced construction," as defined in the statute:

(1) before June 1, 1975, it is exempt from PSD review and permitting under the 1977 Amendments;

(2) between June 1, 1975, and August 7, 1977, it is subject to PSD review and permitting under the pre-amendment regulations; and

(3) after August 7, 1977, or not at all, it could be subject to stricter PSD review and permitting under the PSD regulations amended to conform to the 1977 Amendments.

There is no question that Montana Power did not commence construction, under the statutory definition, before June 1, 1975.  It concedes it began no on-site construction

before that date and we determined above that, under the EPA's acceptable interpretation, the company would sustain no substantial loss if it had been forced to cancel or modify its contractual obligations as of that time.

Montana Power argues that, even if it had not commenced construction under the statutory definition before June 1, 1975, it did so before August 7, 1977.  It maintains that the language in § 168, specifying that sources commencing construction in this interim shall be reviewed "in accordance with" the regulations in effect before the 1977 Amendments, preserves the Colstrip Units' grandfather status as established by the district court.  Since we reverse the district court, we need not reach this issue.[30]

Montana Power is at least subject to PSD review and permitting under the pre-amendment regulations.  Even if it commenced construction under the statutory definition before August 7, 1977, the same PSD requirements would apply.  The issue then becomes whether it failed to commence construction before August 7, 1977.  If so, Colstrip Units 3 & 4 might be subject to the stricter PSD review and permitting procedures in the regulations amended to conform to the 1977 Amendments.

*B. Necessary Preconstruction Approvals or Permits.*

After prevailing in the district court, Montana Power began land clearing at the Colstrip site in June 1977.  It asserts these operations began a "program of physical on-site construction" that would have been continuous but for the EPA's order to halt construction in September.[31]  It also argues that its unavoidable loss as of August 7, 1977, had grown to $78.5 million and that this sum was clearly substantial, even using the EPA's ratio approach.

---

**29.**  There is no mention in the statute of satisfying the contractual obligation exemption by an irrevocable commitment to a particular site.

**30.**  We express no opinion what the result would have been had we affirmed the district court's finding that Montana Power was grandfathered under the pre-amendment regulations and yet found that Colstrip Units 3 & 4 were

subject to PSD review and permitting under the 1977 Amendments.

**31.**  The Tribe contends that this activity "consisted merely of removal, by strip mining, of a coal seam underlying the plant site  .  .  . and did not constitute a continuous program of actual construction of Units 3 and 4."

Establishing only that on-site construction had begun or that its unavoidable loss would be substantial is insufficient to meet the definition of "commence" in the 1977 Amendments. It is also necessary to demonstrate a source has all necessary preconstruction approvals or permits prior to the cut-off date.

Montana Power obtained a permit in June 1976 under the Montana Major Facility Siting Act, Mont.Rev.Codes Ann. § 70–801 *et seq.* It did not receive a permit from the state's Department of Health and Environmental Sciences, under the Montana Clean Air Act, Mont.Rev.Codes Ann. § 69–3911 (Supp. 1977), until January 1978.

The company argues that it needed neither permit to satisfy the definition of "commence" in the 1977 Amendments. Alternatively, if any permits were required, it asserts the only one necessary was the one received under the Siting Act, issued before the effective date of the 1977 Amendments.

Because of the way we decide the approvals or permits issue, we do not reach Montana Power's representations about on-site construction begun or substantial loss incurred before August 7, 1977.

### 1. Section 169(2)(B)

Montana Power argues that § 169(2)(B) makes clear it needed no preconstruction permits to satisfy the definition of "commence" in the 1977 Amendments.

Referring to the immediately preceding subsection, § 169(2)(A), which defines "commence" as having "all necessary preconstruction approvals or permits" and either (i) having begun on-site construction or (ii) having entered into sufficient contractual obligations, § 169(2)(B) provides:

> The term "necessary preconstruction approvals or permits" means those permits or approvals, required by the permitting authority as a precondition to undertaking any activity under clauses (i) or (ii) of subparagraph (A) of this paragraph.

The use of the disjunctive "or" in connection with the plural "clauses" creates a significant problem of interpretation.

Montana Power emphasizes the disjunctive "or" and argues that the phrase "any activity under clauses (i) or (ii)" is the grammatical equivalent of "any activity under clause (i) or any activity under clause (ii)." It says that a source must have preconstruction permits necessary for *either* on-site construction *or* entering into contractual obligations, but not both. Since the contractual obligations on which it relies for its PSD exemption claim required no approval from any permitting authority before their execution, the company argues it satisfied the definition of "commence" in § 169(2)(A).

The EPA emphasizes the plural "clauses" and contends the phrase "any activity under clauses (i) or (ii)" means "any activity mentioned in either clause." It argues that the company needed all permits necessary for contracting *and* for on-site construction. Since it had no permit under the Montana Clean Air Act[32] before August 7, 1977, it could not have commenced construction under § 169(2)(A).

The disputed phrase is ambiguous and could be given either interpretation, another example of poor drafting requiring judicial deciphering. Unfortunately, the legislative history is equally confused.

The definition of "commence" in the 1977 Amendments, as reported out of committee, did not define "necessary preconstruction approvals or permits." During Senate debate on the measure, Senator Henry M. Jackson proposed an amendment:

> [T]he term "necessary preconstruction approvals or permits" means those permits or approvals, *if any*, required as a precondition to undertaking any activity *relied upon by an owner or operator to satisfy the requirements in* clauses (i) or (ii)
> . . . .

---

32. The need for a permit under the Montana Clean Air Act, in addition to one under the Siting Act, is discussed later.

123 Cong.Rec. at S9455 (daily ed., June 10, 1977) (emphasis added). The emphasized words were deleted later by a House and Senate Conference Committee.

Montana Power argues that Senator Jackson's explanation of the amendment on the Senate floor confirms its interpretation.[33] It contends a contrary interpretation, as that offered by the EPA, might moot the appeal from the district court, something that Congress seemingly tried to avoid.[34] Since the Conference Committee, in reporting out the altered version of Senator Jackson's amendment, declared there had been only "a slight modification of the 'commenced construction' definition," [35]

H.R.Rep. No. 95–564, 95th Cong., 1st Sess. 153 (1977), U.S.Code Cong. & Admin.News 1977, p. 1533, the company says the original intent of Jackson's amendment was preserved. That intent allegedly was to permit a source that had relied only on its contractual commitments for its PSD exemption claim to satisfy the permit requirement automatically because it needed no permits just to execute contracts.[36]

The EPA responds that, even if Montana Power correctly read Senator Jackson's intent in offering the amendment, Congress did not agree. It cites the Senate Report describing the purpose of the definition of

---

**33.** Senator Jackson stated:

This amendment would . . . clarify the relationship between this legislative action and some litigation with respect to Colstrip units 3 and 4 in Montana. If the court finds that the activities undertaken by the owners satisfy the tests in clause (i) or (ii) on page 19, and the owners obtained permits required to be obtained to undertake those activities, then construction could proceed without waiting for additional EPA approval. 123 Cong.Rec. at S9455 (daily ed. June 10, 1977).

**34.** The senator commented that his amendment would not "prejudice the litigation that is pending. All the issues in the litigation are preserved." 123 Cong.Rec. at S9455 (daily ed. June 10, 1977). Senator Muskie stated that he understood the amendment's effect was "to neutralize the bill's effect on [the Colstrip] judicial proceeding." Id. at S9460. See also Senator McClure's remarks, id. at S9460–61.

**35.** The Conference Report explained that the changes in Senator Jackson's amendment constituted

a slight modification of the "commenced construction" definition to clarify the intent that a source must have approval before construction may begin, and that any source that has begun construction without approval may not argue that construction activity alone (within the meaning of clauses (i) and (ii)) is adequate to meet the requirement of paragraph [2(A)]."

H.R.Rep. No. 95–564, 95th Cong., 1st Sess. 153 (1977), U.S.Code Cong. & Admin.Laws 1977, p. 1533.

**36.** The company also attempts to support its interpretation by submitting letters from Senators Jackson and McClure written in November 1977, several months after these floor debates, to executives of the consortium members.

We agree with the court in *Epstein v. Resor*, 296 F.Supp. 214 (N.D.Cal.1969), aff'd, 421 F.2d 930 (9th Cir.), *cert. denied*, 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970):

Statements made by legislators in debate can be a part of the legislative history which guides courts in statutory construction. See *Bindczyck v. Finucane*, 342 U.S. 76, 72 S.Ct. 130, 96 L.Ed. 100 (1951). On the other hand, statements made by a legislator after enactment of a statute and not a part of the records of the legislative body are entitled to little or no weight at all. *National School of Aeronautics, Inc. v. United States*, 142 F.Supp. 933, 135 Ct.Cl. 343 (1956). See also, *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Such statements are not offered by way of committee report and are not offered for response by other members of the law-making body. The intent which is helpful in interpreting a statute, is the intent of the legislature and not of one of its members.

. . .

296 F.Supp. at 216. *Accord, Gardner & North Roofing & Siding Corp. v. Board of Governors, Federal Reserve System*, 150 U.S.App.D.C. 329, 333, 464 F.2d 838, 842 (1972). See also 2A Sands, Sutherland Statutory Construction § 48.15 (4th ed. 1973). We do not consider the letters as part of the legislative history or entitled to any weight.

The company asks that we consider a memorandum Senator Jackson enclosed with his letter. It described his intention in submitting his amendment and was apparently circulated to members of the Conference Committee. It is not, however, "a part of the records of the legislative body," *Epstein*, 296 F.Supp. at 216, and we have no way to measure the response of Conference Committee members to the policy underlying the memorandum. It may be an accurate reflection of the senator's intent but is not probative of congressional intent in passing the modified version.

"commence," a comment by Senator Jackson as an introduction to his amendment, and remarks of Senator Muskie, to show a congressional intent that a source needed *all* preconstruction permits, notably those necessary for on-site construction, to satisfy the definition of "commence" in § 169(2)(A).[37] It reminds us that the version that emerged from the Conference Committee removed any possibility of a different interpretation.[38]

Although conceding that Congress wanted to preserve the issues in the district court case, the EPA also quotes remarks by the chief sponsor of the 1977 Amendments in the House that the Conference Committee intended to create no special exception for Colstrip Units 3 & 4,[39] which the EPA

---

**37.** Before Senator Jackson introduced his floor amendment, the Senate Report on the 1977 Amendments stated the purpose of the definition of commence is to make "[t]he date at which construction is said to have commenced . . . the time at which the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State or local laws and has committed itself to a program of construction." S.Rep. No. 95–127, 95th Cong., 1st Sess. 32 (1977). The EPA argues that this language, on its face, forecloses Montana Power's interpretation of what permits it needed.

In proposing his floor amendment, Senator Jackson described it as "a technical amendment . . . [that] is noncontroversial." 123 Cong.Rec. at S9455 (daily ed. June 10, 1977). The EPA contends that if the amendment is understood as Montana Power proposes and Senator Jackson ostensibly intended, it would have substantially changed the purpose of the "commence" definition as described in the Senate Report and therefore could not have been merely a "technical amendment."

The EPA maintains that congressional understanding of the amendment was closer to the interpretation expressed by Senator Muskie, chairman of the subcommittee that drafted the 1977 Amendments and the principal sponsor, in response to the proposed amendment:

> On the basis which [Senator Jackson] has briefly outlined, I am prepared to accept the amendment. It is consistent with the intent of the committee in drafting this definition of "commenced construction." The committee was interested in whether the owner or operator of a proposed facility had the preconstruction permits, certificates, or clearances which would have justified the sizable commitments necessary to meet the tests of a continuous program of physical construction or obligations which cannot be canceled without substantial loss. If an owner of a proposed facility can demonstrate that he had *all the air quality-related clearance necessary to construct the facility,* and was not making the commitments involved entirely at his own risk, before he could be assured that construction could legally take, then such physical construction or contractual obligations might be deemed to have commenced construction within the meaning of this definition.

It should be added that for a contractual obligation to qualify a source as having commenced construction, the definition requires that the obligation be in connection with a continuous program of construction. Only continuous and significant site preparation work, such as major clearing or excavation or placement of unique facilities at the site should be considered a program of construction. *All necessary air pollution, emissions, and air quality approvals or permits required for such activities would be required by this clarifying amendment.*

*Id.*

**38.** The amendment as originally proposed read:

> [T]he term "necessary preconstruction approvals or permits" means those permits or approvals, *if any,* required as a precondition to undertaking any activity *relied upon by an owner or operator to satisfy the requirements in* clauses (i) or (ii) . . . . .

123 Cong.Rec. at S9455 (daily ed. June 10, 1977). The Conference Committee version, which became § 169(2)(B), deleted the emphasized words, substituting "under" for the second italicized phrase.

The EPA argues that the deletion of "if any" eliminated the possibility that *no* preconstruction approvals or permits would be necessary. Deletion of the second phrase, it maintains, removed any reference to, and thus the importance of, activities a source relied on in its PSD exemption claim.

Although the Conference Committee Report indicated the deletions were only a "slight modification" of the Jackson amendment, EPA contends this description applies to *Congress'* understanding of the original amendment and not to Senator Jackson's intent.

**39.** In reporting on the Conference Committee bill, Representative Rogers stated:

> Mr. Speaker, in the State of Montana there is a proposed power plant project known as Colstrip 3 and 4. I have heard allegations that this project might receive special, favored treatment under the definition of "necessary preconstruction permits" in this conference bill. I can say that the "necessary preconstruction permit" definition in this bill will apply equally to all major emitting facili-

contends would result by using Montana Power's interpretation of the Jackson amendment.

The EPA finally argues Senator Jackson held the mistaken idea that, when he proposed his amendment, Montana Power had all necessary permits for on-site construction. This is consistent, the agency contends, with his comment that Montana Power "ha[d] completely complied with the law" and that his amendment would "not prejudice the litigation that is pending" in the district court.

The legislative history is rife with inconsistencies, and the explanations of the parties attempting to rationalize it to correspond with their different interpretations are often strained. When conflicting, inconclusive views form the greater part of the legislative history, we are left with divining the "intent" of Congress from the overall purpose of the statute in question.

One of the declared purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Clean Air Act § 101(b)(1). PSD review and permitting is the only method of enforcing the allowable pollution increments applicable to sources such as Colstrip Units 3 & 4. Exemptions claimed from PSD review and permitting therefore must be so examined as not to contravene the basic policy of the Act.

Section 169(2)(A) requires a source seeking to satisfy the definition of commence to obtain "*all* necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations" (emphasis added). On its face, this language admits of no exceptions.

The *kind* of permits specified is also important. By requiring "*preconstruction* approvals or permits," the language of the statute implies that the kinds of permits required are those necessary to begin construction. This does not coincide with Montana Power's understanding that it did not need any construction permits to satisfy the definition of "commence" because it relied only upon its contractual obligations to claim a PSD exemption, and no permits are necessary to enter contracts.

All parties agree that the § 169(2) definition of "commence" is stricter than the pre-amendment regulatory definition. Yet, when the regulatory definition is viewed in light of the Strelow Memoranda, there is but one important distinction that could make the statutory definition stricter. As interpreted by the Memoranda, the regulatory definition made possession of necessary preconstruction permits only a "relevant factor" in determining if a source was irrevocably committed to a specific site. In § 169(2)(A)–(B), possession of required permits is mandatory to satisfy the definition of commence. This casts doubt on any interpretation of the statute that would weaken the definition of "commence" and allow a source to satisfy it easily.

Montana Power suggests a definition of § 169(2)(A)–(B) that would allow a source to "commence construction" merely by entering into contractual commitments. Under this interpretation a source could begin construction illegally, lacking the necessary permits, but satisfy the definition of "commence" as long as it relied solely on its contractual obligations in claiming PSD exemption. This is hardly a "stricter defini-

---

ties through the country. The conference committee did not intend to hand out any special exceptions or to impose any special burdens. There was some concern expressed that this might interfere with litigation now pending with respect to the Colstrip project. It is not intended to have that effect. All the issues in that litigation are preserved. I assume there is a complicated factual situation involved to which I have not been exposed. This definition "necessary preconstruction

permits" does not automatically decide whether the project is commenced or not. The effect is neutral.

Personally, not being familiar with the particular facts, I do not know if the "necessary preconstruction permits" language in this bill will help or hurt Colstrip. But no special or favored treatment was intended by the conference committee.

123 Cong.Rec. at H8665 (daily ed. Aug. 4, 1977).

tion" than that in the regulations, and we doubt Congress intended such a result.

■ Senator Jackson may have intended in his proposed amendment to allow Colstrip Units 3 & 4 to satisfy the permit requirement under § 169(2)(A) merely on the basis of its contractual commitments. But so interpreted, the amendment appears to be special legislation the primary purpose of which is to benefit Montana Power. Absent a clearer showing, we are unwilling to ascribe this intent to Congress. If Congress had wanted the Jackson amendment to protect the Colstrip Units against the possible adverse effects of the 1977 Amendments, it could easily have so stated. It did not.

### 2. Requirements of the Montana Clean Air Act

Even if the phrase "necessary preconstruction approvals or permits" in § 169(2)(A)–(B) is interpreted to mean those permits necessary for actual on-site construction, Montana Power argues it obtained the only permit required before the effective date of the 1977 Amendments.

The company received approval under the Montana Major Facility Siting Act, Mont. Rev.Codes Ann. §§ 70–801 *et seq.*, in July 1976. It received no permit under the state Clean Air Act, Mont.Rev.Codes Ann. §§ 69–3906 *et seq.*, until January 1978. It asserts that the state Clean Air Act permit is not required under § 169(2)(A)–(B), and that it sought one only to avoid protracted litigation as to its necessity. The EPA contends that permits under both the Siting Act and the state Clean Air Act are "necessary preconstruction approvals or permits."

The state Clean Air Act was enacted in 1967. With its regulations, it is part of the state's implementation plan under the federal Clean Air Act. While a parent organization administers the plan generally, the Board of Health and Environmental Sciences controls the permitting of all new sources of air pollution:

> The board may by rule prohibit the construction, installation, alteration, or use of a machine, equipment, device, or facility which it finds may directly or indirect-

ly cause or contribute to air pollution . . . ., unless a permit therefor has been obtained.

Mont.Rev.Codes Ann. § 69–3911. The regulations require two permits, one for construction and one for operation or use. Mont.Admin.Code §§ 16–2.14(1)–S1400(1)–(9), (11).

The Major Facility Siting Act, enacted in 1973, specifically governs "the construction of additional power or energy conversion facilities" and is meant "to ensure that the location, construction and operation of power and energy conversion facilities will produce minimal adverse effects on the environment." Mont.Rev.Codes Ann. § 70–802. Before a facility may be constructed or operated, it must obtain a "certificate of environmental compatibility and public need," the equivalent of a permit. *Id.* at § 70–804.

The Board of Natural Resources and Conservation controls the issuance of permits under the Siting Act. It may not grant one unless it determines

> that duly authorized state air and water quality agencies have certified that the proposed facility will not violate state and federally established standards and implementation plans . . . .

*Id.* at § 70–810(1)(h). The relevant agency is the Board of Health, which is responsible for issuing a permit under the state Clean Air Act.

Section 70–817 of the Siting Act provides that, once a permit under the act has been granted,

> [n]otwithstanding any other law, no state or regional agency, or municipality or other local government, may require any approval, consent, permit, certificate, or other condition for the construction, operation, or maintenance of a facility authorized by a certificate issued pursuant to this chapter; *except* that the state air and water quality agency or agencies shall retain authority which they have or may be granted to determine compliance of the proposed facility with state and federal standards and implementation

plans for air and water quality and to enforce those standards . . .. (Emphasis added.)

Montana Power argues that findings of the Board of Health in certifying a source to the Board of Natural Resources under the Siting Act duplicate those it must make under the state Clean Air Act. Since the Siting Act deals specifically with new energy sources and is, comprehensive to the exclusion of other state statutes,[40] the company argues that the certification by the Board of Health that was necessary to obtain its Siting Act permit constitutes permission to construct under the state Clean Air Act as well.

The company reads narrowly the exception to § 70–817, which protects the authority of state air quality agencies like the Board of Health "to determine compliance of the proposed facility with state and federal standards." Instead of interpreting the exception as ensuring the Board of Health's power to issue construction permits, which might detract from the comprehensive scheme of the Siting Act, Montana Power argues that the exception only preserves the Board's power to grant use permits, for which there is no analogue in the Siting Act. Since a use permit is issued only after a source is constructed, it cannot be a preconstruction approval or permit required by the definition of "commence" in § 169(2)(A).

This understanding of the relationship between the state Clean Air Act and the Siting Act is strained, at best. The language of § 70–817 preserving the authority of the Board of Health is not limited to issuing use permits.[41] It allows the Board "to determine compliance of the proposed facility" with applicable standards. Use permits granted after a facility is built cannot be for a "proposed" facility.

■ Whether construction permits required under the state Clean Air Act and Siting Act are duplicative is not our concern. That is a matter for the Montana legislature. Section 169(2)(A)–(B) requires a source to obtain "those permits or approvals . . . required by the permitting authority," in this case the State of Montana and its agencies.[42] Since Montana Power did not have both a state Clean Air Act permit and a Siting Act permit before August 7, 1977, it did not commence construction under the definition in the 1977 Amendments.[43]

## IV.

## CONCLUSION

■ Montana Power did not commence construction of Colstrip Units 3 & 4, as that of the Siting Act appears in a condition of the Board's certification of the Colstrip project to the Board of Natural Resources under the Siting Act:

> The certification with conditions herein set forth does not constitute a waiver of any of the requirements of the Clean Air Act, the Water Pollution Control Act or the implementation plan, including the necessity of obtaining a permit in accordance with the rules and regulations implemented under [the state Clean Air Act] Section 69–3911, RCM 1947.

**40.** In addition to the first clause in § 70–817, Montana Power cites § 70–823 for support that the Siting Act preempts legislation dealing with the same concerns:

> This chapter supersedes other laws or regulations. If any provision of this chapter is in conflict with any other law of this state, or any rule or regulation promulgated thereunder, this chapter shall govern and control, and the other law, rule or regulation shall be deemed superseded for the purpose of this chapter.

**41.** Nor does § 70–823, providing that the Siting Act "supersedes other laws or regulations," require a different conclusion. That section invalidates only those statutes "in conflict with" the Siting Act. The construction permit mandated by the state Clean Air Act might duplicate the permit requirement under the Siting Act, but does not "conflict with" it.

**42.** That the Board of Health concluded Montana Power still needed a construction permit under the state Clean Air Act despite any effect

**43.** We do not base our conclusion on the EPA's allegation that the necessity of a state Clean Air Act permit had been fully litigated to Montana Power's disadvantage, nor on the company's alleged waiver of its argument precipitated by its acceptance of the state Clean Air Act permit.

358

term is defined in the pre-amendment regulations, before June 1, 1975. Nor did it commence construction under § 169(2)(A) of the 1977 Amendments before August 7, 1977. The units therefore are subject to PSD review and permitting as outlined in the amended Clean Air Act and the applicable regulations.

The district court judgment in Nos. 77–2253 and 77–2521 is REVERSED and the EPA's determination in No. 78–1140 is AFFIRMED.